Okay, the last case being argued today is United States v. Vidal. And we have Mr. Proust, Mr. Vidal. You have two minutes for rebuttal, and you can begin whenever you're ready. Okay. May it please the Court, good morning, Your Honor. My name is Robert Proust. I'm appearing on Mr. Vidal's part. The key question here is what do we make of the endorsements? Now, we cited the Rodriguez case, which obviously said that endorsement and – oh, it said there a deposit, but it's essentially the same thing, since the deposit would still transfer the possession of the money. So the question is, is that a false statement being made to the bank for the purpose of mail – of fraud, bank fraud? And it seems to me it's not. And I understand the argument that there was a preprinted – there were preprinted comments on the endorsement. The trouble is there's no evidence that he ever really read those or even that he could have read them because there is evidence that he only understood Spanish. I know, but that's not an issue. Look, let me see if you can agree with me on this. If you – an endorsement requires you to get the money to certify that you're going to use the funds as payment for a purchase of a particular vehicle, right, that clearly was not done here, first of all. Do you agree with that? Yes, I agree. Okay. And you make that representation. And based upon that representation, the bank gives you the money that they otherwise would not give you unless you signed with that representation. Why is that not classic bank fraud? You're making a false representation to obtain the bank's money that you would otherwise not get. You're going to issues of whether he read it or not. That just goes to the issue of his intent. But in terms of whether or not that qualifies as a bank fraud, isn't that enough for bank fraud? Well, but he didn't make those representations to the bank. He signed the check that right where – I mean, I have it right here. He signed the endorsements are right below where he signed, all of them, right, repeatedly. I mean, how many checks were there like that? At least one which wasn't Spanish. Well, still, if you're going to use that, it seems to me that one would want to have some kind of evidence on the record that he actually understood or read and adopted that – the language underneath it, particularly since that was printed by the bank. It wasn't his statement. In the other cases I've read, at least, you generally have somebody who actually makes an affirmative misrepresentation. You know, they write something out or what have you. In this case, you have what would be a passive and not necessarily a misrepresentation depending on whether or not he – I don't know. This is in the context of other evidence. Like the people who were saying that they had conversations with your client and that he knew they were not getting the car, that they were just generating cash. It was the same car over and over again being put forth as the basis for the loan. So why can't a jury – we have to construe the – for a sufficiency argument, the evidence most favorable to the government. Why can't a jury conclude your client knew exactly what was going on, including the fact that the bank required this to be used for the car? Well, again, that information with regard to the car would have come from the endorsement. So if that's where that information is being derived from and that was preprinted by the bank, it seems to me there has to be some obligation to show evidence that he – Why isn't it a permissible inference? I mean, the very nature of signing your name to a document is that you are endorsing the document. Now, there may be arguments why that should not be assumed in a particular case, but why isn't it enough to get the case to the jury? Because that's your argument, is that as a matter of law, the jury couldn't find him guilty. Judge, I – yes, that's true. But I – seems to me – He signed his name to it. He signed his name to it when it was in English. He signed his name to it when it was in Spanish. Why couldn't the jury assume that this was indeed the representation he was making to the bank and that it was false? Well, I think there should have been evidence, direct evidence that he understood what was going on. Indeed, that could have been an argument to the jury, that they shouldn't be convinced beyond a reasonable doubt without that. But if they were, given the number of times he signed it in the two languages, why couldn't – why would we upset the jury verdict? Well, I don't think you should. Okay. The other issue, though, is also the credit cards and the – and the – what do you call it? The conspiracy. And it seems to me this – even if one assumes that he knew what was going on with the – in regards to the checks, to find a conspiracy, it seems to me you have to show some connection, particularly since massive amounts of evidence came in about all these loan applications and all the other stuff that was actually – was given to the banks. And he had nothing to do with that. And there's no evidence that he knew even about it in any way. I know, but he doesn't have to be part of every aspect of – if someone else puts in fraudulent statements to the bank, but then there also have to be fraudulent statements on the check. They're both part of the conspiracy. His part was to sign that check with those false endorsements so that they could get the money, right? If he can fill out the false applications to the bank, it doesn't mean that he's not part of the conspiracy, right? Well, it seems to me that there should be some connection to that. At least he knew about the record. There were false statements that had to be made in the application to generate the check so the bank would issue the check.  Those would be those things that were on the check that we've already discussed. So it's just two different parts of the same completion of the same conspiracy to get the banks money. I actually think that the – getting the money was a totally separate transaction because he had no connection to the rest of it at all. And there's no evidence that he did. There's no even claim that he did. Anyway, I think I've used up my time. Thank you. You had some time left. That's okay. We'll let you have your rebuttal. We'll hear from Mr. Perez. I'm sorry, Mr. Pertz. I had my glasses on there. Sorry about that. Good morning, Your Honors. May it please the Court. My name is Josiah Pertz, representing the government, and I represented the government at trial. This is, in fact, a classic case of bank fraud. The evidence was overwhelming that Edouard Vidal participated in a scheme to defraud credit unions in connection with fraudulent car loan applications. The evidence was sufficient for the conspiracy count, count one, and sufficient for the substantive bank fraud count, count two. It was sufficient on both clauses of the bank fraud substantive count, both a scheme to defraud the credit unions under clause one and a scheme to obtain property under their custody and control. The Court today has already mentioned some of those types of evidence, 18 checks that the defendant signed for five different cars only, and several of those checks were for the same borrower, a borrower getting multiple checks, tens of thousands of dollars for the same vehicle. The Court also mentioned the testimony from two of these borrowers during their meetings with Edouard Vidal and another co-conspirator who arranged the applications, during which they discussed the scheme and during which the borrower made clear to Vidal that no car purchase was part of this. This was all about getting cash and getting cash at a lower interest rate than would have been possible had this been a personal loan. The appellant has mentioned briefly this credit card evidence. It was a very small part of the record, but there was no error here, and if anything, it supported the underlying scheme and its existence. In summary, one of the witnesses, the borrowers, testified that she had brought credit cards, which were fraudulently obtained from the same credit unions, to Vidal, and he swiped them at his dealership and returned a promise of cash to her. This was part of the same scheme because it was another attempt to get cash from credit unions for no legitimate service. It had nothing to do with his dealership. There was no car-related service that was provided in exchange for the swiping of the credit cards. All there was was this attempt to get cash from a credit union for no legitimate service. So I understand how that's a separate fraudulent activity. How is it intertwined with the charged crime? It's intertwined in several ways. First, identity of participants. You had the same borrowers, the same car dealer, same car dealership, and the same other co-conspirators, the people at the credit repair service, so-called, who were arranging this service. The object of the scheme, just that subset of it, was the same, to obtain cash for no legitimate services. There were applications filed for credit cards that were filed simultaneously with the applications for the other kinds of loans. And the conversations that were had between the borrower, Ms. Duarte, and the other co-conspirators, the people at the credit repair, happened simultaneously to conversations about the auto loans. So if the object is the same, while the means may have been slightly different, not representing that this was for a car purchase, but representing that it was personal credit cards, the object was the same. So am I correct that it's offered under 404B as evidence of intent, as evidence of motive, but I want to be sure I understand it. On what theory do you think that this separate crime comes in? There were multiple theories offered. The government offered it both under 404B as evidence of intent, common scheme or plan, lack of mistake, and also as substantive evidence of the underlying scheme. And I believe the court admitted it. I'm not sure I understand how it is substantive evidence of the underlying scheme, especially in light of what we heard from counsel in oral argument. I understand how it may be evidence of knowledge, intent to defraud these particular victims, but I'm not sure how it proves the underlying scheme, the underlying charged scheme. Maybe you don't need that, but if that's your argument, I wanted to be sure I understood it. We are arguing both. With help of co-counsel here, I'll read just a portion of United States v. Carboni cited in our brief at page 28. Evidence is admissible without reference to Rule 404B if it arose out of the same transaction or series of transactions. Your argument on that, and you can correct me if I'm wrong, but I understood you to be saying that the whole scheme was to use a fake purchase of a car to generate cash and that there were two different ways that they did that. One was by getting the bank to issue this check for a purchase that was not going to happen and to run a credit card through the same, maybe I'm misunderstanding the records, the same car business that the credit card was run through, right? Correct. So they ran that through as another way to generate additional cash in connection with a fake car purchase, right? True. It's also a way to complete the story. The credit cards are the first interaction that Gloria Duarte had with Edouard Vidal. And in asking the witness, what happened, how did you first meet this person, their initial interaction was, I went to his car dealership, I went there to get money, and the first way we did it was with these cards. Beyond that, it explored a certain amount of the witness's relationship with Vidal and was also necessary to complete the story for that reason, because this credit card piece of the scheme was not successful for Ms. Duarte. She didn't initially get the cash right back. What she got from Mr. Vidal was a promise to give her cash in the future, which he didn't comply with. Instead, he offered her the chance to sell cars for him. So because it not only is evidence of a similar scheme or plan writ large under 404B but also is intertwined with the evidence regarding the charge of offense and necessary to complete the story, there are two theories there under which it's admissible, and even if it weren't, it would be harmless given the weight of the evidence in other respects. I believe the only other point that had not been mentioned directly in Appellant's presentation was his third point about admission of co-conspirator hearsay. As has been discussed already, this was a scheme that involved multiple participants, involved this credit repair agency. Testimony at trial established that there were meetings among these individuals, that the entire scheme was discussed at the credit repair agency, at Vidal's dealership, and that several of these people went to the same check cashing store to, in fact, retrieve the proceeds. So any statements that were made in furtherance by those individuals and admissible or admitted at trial were, in fact, admissible. Unless the Court has further questions, the government respectfully requests that the judgment of conviction be affirmed. All right. Thank you. Mr. Proust, you have two minutes. First, it doesn't actually appear that Duarte ever met Vidal, as far as I can tell from the record. She admitted that everything was done through the card place, Felix, and that he took care of all the transactions, and it came from him that Vidal had cashed the checks. Also, at the time that this happened, and frankly, without the hearsay evidence, I don't think there's overwhelming evidence at all. I mean, it seems to me, yes, you have one transaction, and as I said, he did not appear to understand or certainly there's no evidence on the record that he understood the endorsements and what they meant. These are statements by the bank, not his statements. But when you go – when you start adding all these other things, transactions, which he's not a part of, he's not even close to them, he may not even know about them. There's no evidence that he knew about them. Didn't Batista testify that – told Vidal that she did not intend to buy the car? Yes, she did testify to that. So why isn't that important? His understanding, you know, independent of the endorsements, that this was all a scam. But this fraud was much more than just that they were getting money for a car. They were – they were making all kinds of representations in those loan applications and the credit card applications, which were separate. They were making all kinds of representations, and there's no evidence that he understood any of that. The whole point is that, again, they're just generating cash. One way is to get the check from the bank for a car that's not going to take place, and another way is just to run up the credit card. Duarte testified, even though she had no intention of buying the car, Fields applied for the loans and gave the checks to Vidal so he could take care of the cash – the cashing process. So the understanding was we got two ways we're going to generate cash. One is with this check we're going to get from the bank for the car, and then we're going to run up the credit card as well. It was all part of the same scheme to generate cash for nothing. Well, I have to point out, they gave defense counsel notice this two days before the trial. But aside from that, the bottom line is the credit cards really were a totally independent thing. They weren't really making a four or three on the variance argument in the indictment? That's what I thought you were arguing in your brief. Yeah, well, it was outside the scope of the indictment. It's not what he was charged with. It's either an uncharged crime or probably not an uncharged crime because I don't think there's anything criminal about giving people money on credit cards. All right. All right. Thank you. We'll reserve the decision. Have a good day.